**The below described is SIGNED.**





**Dated: March 31, 2014**

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 08-20105 |
| C.W. Mining Company dba Co-Op Mining Company, | Chapter 7 |
| Debtor. | Judge R. Kimball Mosier |
| Kenneth A. Rushton, Chapter 7 trustee, | |
| Plaintiff, | |
| v. | |
| Tennessee Valley Authority and Standard Industries, Inc., | Adversary Proceeding No. 10-2816 |
| Defendants. | |
| | **FINDINGS AND CONCLUSIONS IN SUPPORT OF ORDER GRANTING TENNESSEE VALLEY AUTHORITY'S MOTION FOR SUMMARY JUDGMENT** |

This adversary proceeding is one of many brought by Kenneth A. Rushton (Trustee) that puts the relationship between C. W. Mining Company (Debtor) and Standard Industries, Inc. at issue.  In a related consolidated adversary proceeding, this Court has entered partial summary judgment (Agency Ruling) finding that Standard acted as the Debtor's authorized agent for the sale of coal, with authority to request and receive payments from coal purchasers, including the Tennessee Valley Authority (TVA).  Subsequent to the Agency Ruling, TVA filed its motion for summary judgment and dismissal of this adversary proceeding, and the Trustee filed his motion for partial summary judgment.  Because the Estate has already received what the Trustee seeks to recover from TVA and because the Trustee seeks to enforce an improper and unenforceable lien, the Court will grant TVA's motion for summary judgment and deny the Trustee's motion for partial summary judgment.

## I.  JURISDICTION

The jurisdiction of this Court is properly invoked under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding within the meaning of  28 U.S.C. § 157(b)(2)(A), (E), (F) & (O), and this Court may enter a final order.  Venue is proper under the provisions of 28 U.S.C. § 1408 and 1409.

## II.  FINDINGS OF FACT

C.O.P. Coal Development Company and the Debtor entered into a Coal Operating Agreement in March 1997, which permitted the Debtor to mine coal from the Bear Canyon Mine. Standard began acting as the Debtor's agent for the sale of coal as early as 2001, and on March 5,

2007, the Debtor and Standard entered into a written Coal Sales Agency Agreement (Agency Agreement). The Agency Agreement appoints Standard as the Debtor's exclusive sales agent for coal mined during the term of the Agency Agreement. Although the Agency Agreement contains ambiguities, it is not ambiguous with respect to Standard's agency relationship with the Debtor for the sale of coal and the collection of payments on coal purchases. In August 2002, the Debtor entered into a coal purchase agreement with TVA (TVA Contract).

The Debtor, Standard and TVA maintain that TVA was advised by the Debtor and Standard that all of the Debtor's interest in any amounts due under the TVA Contract was assigned to Standard (Standard Assignment) as of August 8, 2002.[1] Between August 2002 and June 2008, Standard invoiced TVA for coal purchased pursuant to the TVA Contract, and TVA paid the invoiced amount to Standard.

On October 30, 2007, Aquila, Inc. obtained a $24,841,988 judgment against the Debtor in the United States District Court for the District of Utah. On November 16, 2007, the District Court issued a writ of garnishment, which was served on TVA. The writ of garnishment directed TVA not to pay the Debtor money that was due to the Debtor. On December 18, 2007, the District Court issued a second writ of garnishment, which was served on TVA. The second writ of garnishment was a continuing writ and directed TVA not to pay the Debtor money that was presently due to the Debtor or that would became due to the Debtor in the future.

---

[1] The Court makes no finding as to whether an assignment from the Debtor to Standard actually took place, nor does the Court make any finding as to the legal effect of any such assignment. The Court's finding is limited to a finding that TVA *was advised* by the Debtor that it had assigned its interest in the receivables from the TVA Contract to Standard.

TVA timely responded to both writs of garnishment (Garnishment Writs) and the accompanying interrogatories.  The written interrogatories asked, among other questions, "Are you indebted to [C.W. Mining] in either property or money?"  Each time TVA answered this question, "No."  In its response to the interrogatories, TVA explained that payments for coal it had purchased pursuant to the TVA Contract were owed to Standard under the terms of the Standard Assignment, and identified the Standard invoices that were unpaid at the time TVA received the Garnishment Writs.  The invoices Aquila attempted to garnish totaled $2,510,550.26 (Garnished Accounts).[2]  TVA complied with the Garnishment Writs and withheld payment of the Garnished Accounts prior to the bankruptcy filing.

Standard opposed Aquila's garnishment, asserting its ownership of the Garnished Accounts, and the District Court held a status conference on January 3, 2008.  As reflected in the transcript of the status conference, Aquila, the Debtor, and Standard had been involved in settlement discussions and Aquila's counsel specifically moved the District Court to release $2,000,000 of the Garnished Accounts to the Debtor, but Aquila's motion was not ruled on at the status conference.  The District Court scheduled an additional status conference for February 1, 2008 and a hearing to consider Standard's motion to quash the Garnishment Writs for February 27, 2008, but those hearings were never held.  On January 8, 2008, Aquila, along with two other petitioning creditors, filed an involuntary bankruptcy petition against C.W. Mining under chapter 11 of the Bankruptcy Code.

---

[2] TVA held seven invoices when the second and final garnishment was served; two invoices (Nos. 5537 and 5542), both in the amount of $423,416.40, were duplicative.  The correct amount of the outstanding invoices was $2,510,550.26, rather than the erroneously invoiced amount of $2,933,966.66 alleged by the Trustee in his Complaint.

There is no assertion by any party that either the Debtor or Standard ever terminated Standard's agency relationship.  In fact, Charles Reynolds (Debtor's President) asserts that postpetition he reaffirmed to Aaron Kingston (Standard's Contract Administrator) that the Debtor and Standard would continue to conduct business as they had before the involuntary petition was filed.

Although Aquila did not specifically release its garnishment, it did promptly file a "Notice of Involuntary Bankruptcy Case Against C.W. Mining Company, and Limited Response of Aquila to Motion by Standard Industries to Quash Aquila's Garnishments" (Notice of Involuntary Bankruptcy) with the District Court and served it on TVA.  In the Notice of Involuntary Bankruptcy, Aquila asserted that the "bankruptcy petition operates as an automatic stay" and that the bankruptcy court "should address issues related to outstanding writs of garnishment, unless or until the automatic stay in bankruptcy is lifted."

After the bankruptcy petition was filed, the District Court entered an order referring the garnishment matter to the bankruptcy court.  After it initiated the involuntary petition, Aquila did not seek relief from the automatic stay and never asserted it was entitled to the garnished funds or made any effort to enforce the Garnishment Writs.  Postpetition, Aquila filed a motion in this bankruptcy case for an order preserving and protecting assets of the Estate, but did not seek to restrain Debtor's receipt or use of accounts receivable.

Soon after the involuntary petition was filed, Standard informed TVA that the Debtor would be forced to shut down its operations if TVA did not immediately pay Standard the invoices that were due under the TVA Contract.  TVA then paid Standard the $2,510,550.26 it

had withheld pursuant to the Garnishment Writs.  TVA made no effort to file an accounting

pursuant to § 543(b)(2)[3]  and Fed. R. Bankr. P. 6002 with this Court.

On September 26, 2008, an order for relief was entered in the Debtor's involuntary

bankruptcy proceeding.  The Debtor's case was converted to a case under chapter 7 and the

Trustee was appointed.  The Trustee filed an avoidance action pursuant to § 547 against Aquila

to recover alleged preference payments, was able to avoid Aquila's garnishment lien, and

obtained a judgment in the amount of $249,991.06, which Aquila satisfied.

On September 30, 2013, the Court entered the Agency Ruling in consolidated adversary

proceeding no. 11-8002.  The Agency Ruling held that Standard acted as the Debtor's authorized

agent for the sale of coal during the postpetition period until the order for relief was entered (Gap

Period), with authority to request and receive Gap Period payments from coal purchasers.


## III.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when there is no genuine issue of material fact in

dispute and the moving party is entitled to judgment as a matter of law.[4]  In considering a motion

for summary judgment, the court draws all reasonable inferences in favor of the nonmoving

party.[5]  "The movant bears the initial burden of making a prima facie demonstration of the

---

[3] Statutory references herein are to Title 11 of the United States Code, unless stated
otherwise.

[4] FED. R. CIV. P. 56(a), made applicable to this adversary proceeding by FED. R. BANKR.
P. 7056.

[5] *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[6]  "An

issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could

resolve the issue either way."[7]  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."[8]


## IV.  ANALYSIS

In his complaint the Trustee alleged that TVA paid the Garnished Accounts to Standard

and not the Debtor, and therefore remains liable to the Estate.  Until the Court's Agency Ruling,

there was a genuine issue of material fact regarding Standard's authority to act as the Debtor's

agent.  While Standard's relationship to the Debtor has not been fully resolved, the Agency

Ruling did establish that Standard was the Debtor's agent with authority to request and receive

Gap Period payments from coal purchasers.  TVA brought its summary judgment motion as a

result of the Court's Agency Ruling.  TVA asserts Standard was the Debtor's authorized agent to

receive payments from coal purchasers, and TVA's payments to Standard were payments to the

Debtor.  TVA correctly maintains that it paid the Garnished Accounts to the Debtor.[9]  The Court

acknowledges that the Trustee disagrees with the Agency Ruling, but in light of that ruling, the

---

[6] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998).

[7] *Id*. at 670.

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

[9] Payment to a duly authorized agent is payment to the principal. *See Grazer v. Jones*, 289 P.3d 437, 441 (Utah 2012); *Olsen v. Tholen*, 177 P.2d 75, 77 (Utah 1947).

-7-

Court fails to see the merit in the Trustee's argument that TVA should pay to the Trustee what it

has already paid to the Debtor.

   Because the Debtor received the Garnished Accounts, the Estate was not injured by

TVA's payment to the Debtor.  The Trustee, as representative of the Estate, has no standing to

assert claims against TVA for the Garnished Accounts that were paid to the Debtor because there

is no "injury in fact."  The lack of injury to the Estate is easily revealed.  If TVA had immediately

paid the Garnished Accounts to a chapter 7 trustee after the filing of a voluntary chapter 7

petition, the Trustee could not claim that TVA had not paid the funds to the estate.  The fact that

this case was commenced as an involuntary chapter 11 case and the Debtor in possession

received the payment makes no difference.   Although not expressly stated by the Trustee, his

real objection is that TVA paid the Garnished Accounts to the Debtor's agent, Standard, and they

are not available to the Trustee at this time.  If Standard misused the funds it received in its

capacity as agent, the Trustee may have a claim against Standard (one of many claims he has in

fact asserted against Standard) but he has no claim against TVA.

   In addition to his assertion that TVA wrongfully paid the Garnished Accounts to

Standard, the Trustee's complaint asserts claims against TVA pursuant to § 543(c)(3) for

turnover by a custodian.  The Trustee argues that TVA was a custodian as defined in § 101(11)

and it was required, pursuant to § 543(b), to turn over to the Debtor any of the Debtor's property

in its possession.  But the Trustee's argument fails because TVA did turn over the property in its

possession to the Debtor.  The Trustee also argues that his avoidance action against Aquila

preserved Aquila's garnishment lien for the benefit of the estate under § 551.  This claim fails

because preservation of Aquila's lien, on Estate property that the Estate has already received,

-8-

results in no benefit to the Estate. Additionally, both of these claims are dependant on this Court

giving legal effect to a lien that would have been improperly retained by Aquila in violation of

the automatic stay.

**A. The Trustee Lacks Standing Because the Estate Suffered No Damages as a Result of TVA's Payment to the Debtor.**

When addressing the issue of standing, the Court must begin with an analysis of Article

III constitutional standing requirements even though this is an Article I court. As stated in *In re*

*Bucchino*:

> Bankruptcy jurisdiction is vested in the district court. *See* 28 U.S.C. § 1334(a)
> and (b) (vesting bankruptcy jurisdiction in the district courts). The district court is
> an Article III court. Bankruptcy courts are an adjunct of the district court. 28
> U.S.C. § 151(a). Under 28 U.S.C. § 157(a), district courts may refer the exercise
> of bankruptcy jurisdiction to bankruptcy judges subject to the limitations set forth
> in 28 U.S.C. § 157(b), (c) and (d).[10]

Bankruptcy court jurisdiction, which is derived from district court jurisdiction, is subject to the

same jurisdictional limitations as district courts.

"The doctrine of standing is an essential and unchanging part of the case-or-controversy

requirement of Article III, which itself defines with respect to the Judicial Branch the idea of

separation of powers on which the Federal Government is founded."[11] "Standing represents a

jurisdictional requirement which remains open to review at all stages of the litigation."[12]

The Tenth Circuit Court of Appeals has stated the standing criteria as follows:

---

[10] *Bucchino v. Wells Fargo Bank, N.A. (In re Bucchino)*, 439 B.R. 761, 770 n.10 (Bankr. D.N.M. 2010).

[11] *Ne. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656, 663, 113 S. Ct. 2297 (1993) (citations and internal quotation marks omitted).

[12] *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255, 114 S. Ct. 798 (1994).

[A] plaintiff must satisfy three criteria in order for there to be a "case or controversy" that may be resolved by the federal courts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, there must be a causal connection between that injury and the challenged action of the defendant—the injury must be "fairly traceable" to the defendant, and not the result of the independent action of some third party. *Id.* Finally, it must be likely, not merely speculative, that a favorable judgment will redress the plaintiff's injury. *Id.* at 561, 112 S. Ct. 2130.[13]

It is the plaintiff's burden to support all three criteria.[14]

All of the Trustee's arguments fail to address injury to the Debtor or the Estate. TVA paid the Debtor the full amount of the Garnished Accounts, and the Estate is not entitled to receive more. The Trustee has failed to articulate any "injury in fact" that satisfies the first criterion necessary to establish standing.

## B. The Trustee Has No Claim to a Receivable That the Estate Has Already Received.

A gap period debtor in an involuntary chapter 11 case is a debtor in possession[15] and has the rights, other than the right to receive compensation, and shall perform all the functions and duties of a trustee serving in a chapter 11 case.[16] Involuntary debtors are expressly authorized to continue to operate their business as if the involuntary case had not been commenced. Petitioning creditors who file a chapter 11 involuntary petition waive the right to seek

---

[13] *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

[14] *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1165 (10th Cir. 1996).

[15] Memorandum Decision Granting, in Part, and Denying, in Part, the Trustee's Motion For Partial Summary Judgment Regarding Attorney Fees and Disclosure of Fees, Adversary Proceeding 09-2382, Doc. No. 46. All further citations to filings are to filings in Adversary Proceeding 10-2816 unless otherwise noted.

[16] § 1107(a).

appointment of a trustee during the gap period and consent to the involuntary debtor remaining in

possession of its property and control of its business.  The Trustee does not dispute that TVA

paid the Garnished Accounts to Standard.  The Trustee does not dispute that Standard acted as

Debtor's agent prepetition. The Court has previously concluded, as a matter of law, that the filing

of an involuntary petition does not terminate agency relationships and an involuntary debtor in

possession may act through its agents.[17]  Standard had authority to request and receive TVA's

payment during the Gap Period.

The Trustee argues that, notwithstanding TVA's payment to Standard and the Court's

ruling that Standard was the Debtor's authorized agent to receive TVA's payment,[18] TVA

remains liable to the Estate for the Garnished Accounts because TVA wrongfully paid the

Debtor's agent and the payment should not be recognized.  The Trustee scrupulously avoids any

discussion of injury or damage to the Estate and simply argues that a technical violation of a

court order or Bankruptcy Code provision justifies double recovery.  But the fact of the matter

remains, a party, even a bankruptcy trustee, can have no claim to receive what it has already

received.

## C.  The Trustee's Argument Is Internally Inconsistent.

The Trustee argues that TVA remains liable to the Estate for the Garnished Accounts

because TVA failed to comply with the Garnishment Order and failed to comply with § 523.

---

[17] Findings and Conclusions Regarding Coal Purchasers' Motion For Summary Judgment, Adversary Proceeding 11-8002, Doc. No. 297.

[18] The Trustee does continue to argue that, notwithstanding the Court's ruling that Standard was the Debtor's agent, Standard's full relationship with the Debtor remains in dispute. While this may be true, the law of the case is that Standard was the Debtor's authorized agent.

Even if the Trustee's arguments were all legally correct, the Trustee's argument is logically inconsistent—it suffers from kettle logic. The Trustee strenuously argues that TVA was subject to the Garnishment Writs and could not deliver the Garnished Accounts to the Debtor. He also argues that the Garnishment Writs made TVA a custodian under § 543. Finally, he argues that because TVA is a custodian under § 543, it must deliver the Garnished Accounts to the Debtor. The kettle logic is apparent. In short, the Trustee argues:

> If TVA is a garnishee, it cannot turn over the funds.

> If TVA is a garnishee, it is a custodian.

> If TVA is a custodian, it must turn over the funds.

The Trustee's propositions cannot all be true.

## D.  The Trustee Has No Claim Against TVA Pursuant to the Writs of Garnishment or § 551.

The Trustee's argument with respect to the Garnishment Writs is poorly articulated but appears to be as follows: The Garnishment Writs required TVA to hold all money owed to the Debtor until further order by the District Court; the automatic stay did not invalidate the Garnishment Writs; neither the District Court nor this Court has entered an order with respect to the Garnishment Writs; and the "debt still exists." The Trustee seems to suggest that a garnishee's payment to the proper party should not be recognized if it was not expressly authorized by the court prior to payment.

-12-

**1. TVA Has No Liability to the Estate for a Payment it Has Already Made to the Debtor.**

The Trustee states: "The Garnishments prohibited exoneration[19] by any means not expressly authorized by the District Court, and TVA cannot point to any order authorizing payment to Standard."[20]  "The result of TVA's failure to wait until a court with jurisdiction instructed TVA whom to pay is that TVA has not exonerated its debt to this estate and that debt still exists."[21]  In sum, the Trustee asserts that TVA's payment to the Debtor was not an authorized payment to the Debtor, and TVA must pay again.  The Trustee cites no legal authority to support these statements and they are simply incorrect.  The Garnishment Writs did provide that if TVA failed to take specified steps, "the court *may* hold [TVA] liable for the value of the property [it] should have withheld" but they did not "prohibit exoneration" by any means not expressly authorized by the charging court or negate a payment made to the proper party.

A garnishment simply charges the garnishee to hold funds and creates a conditional liability if the garnishee pays the wrong party.  Utah R. Civ. P. 64D(j)(2)(A) provides:

> If the garnishee fails to comply with this rule, the writ or an order of the court, the court may order the garnishee to appear and show cause why the garnishee should not be ordered to pay **such amounts as are just**, including the value of the property or the balance of the judgment, whichever is less, and reasonable costs

---

[19] It is unclear what the Trustee means by "prohibited exoneration." The Court is interpreting the Trustee's statement to mean that the Garnishment Writs imposed a duty or burden on TVA, and TVA could only free itself of that duty or burden as ordered by the District Court.

[20] Trustee's  Memorandum in Opposition to Tennessee Valley Authority's Motion for Summary Judgment and in Support of Trustee's Motion for Partial Summary Judgment, Doc. No. 97, at 31.

[21] Trustee's Reply Memorandum in Support of Motion for Partial Summary Judgment, Doc. No. 101, at 8.

and attorney fees incurred by parties as a result of the garnishee's failure. If the garnishee shows that the steps taken to secure the property were reasonable, the court may excuse the garnishee's liability in whole or in part.[22]

The Utah Supreme Court has noted that "[w]hile 'such amounts as are just' are not explicitly limited to amounts reflecting the garnishee's liability, it is clear from the context of this provision that actual liability for damages rather than punitive sanctions is provided for in this rule."[23]  If the Garnished Accounts should have been paid to the Debtor, they have been.  If the Trustee is asserting that TVA made a payment to Standard, as opposed to the Debtor, he is once again ignoring the Agency Ruling.  TVA did not pay Standard—TVA paid the Debtor.  Because liability for damages is the basis on which an assessment against the garnishee is made,[24] any claim the Trustee asserts as the recipient of the Garnished Accounts must fail.  The Estate has suffered no damages, and TVA has no further liability.

### 2.  The Writs of Garnishment Were Stayed by the Involuntary Filing.

The § 362 automatic stay provides for a broad stay of litigation, lien enforcement, and other actions, judicial or otherwise.[25]  The stay protects not only property of the estate, but also prohibits any act to collect or recover a claim against the debtor.[26]  The parties agree that the automatic stay, which went into effect at the moment the involuntary petition was filed, had the

---

[22] UTAH R. CIV. P. 64D(j)(2)(A) (emphasis added).

[23] *Colonial Bldg. Supply, LLC v. Constr. Assocs., Inc.*, 257 P.3d 435, 438 (Utah Ct. App. 2011).

[24] *Id*.

[25] *Sec. Investor Prot. Corp. v. Blinder, Robinson & Co.*, 962 F.2d 960, 965 (10th Cir. 1992).

[26] *Id*. at 966; *Valley Transit Mix of Ruidoso, Inc. v. Miller*, 928 F.2d 354, 356 (10th Cir. 1991).

-14-

effect of staying the Garnishment Writs.  A garnishing creditor must release a garnishment as soon as it learns of a pending bankruptcy,[27] and Aquila had a duty to release the Garnishment Writs.

### 3. The Trustee's § 551 Claims Are Based on Aquila's Lien That Was Improperly Retained and Was Unenforceable.

Although Aquila did not specifically release its garnishment, it did abandon its efforts to enforce the Garnishment Writs.  Aquila promptly filed the Notice of Involuntary Bankruptcy with the District Court and served it on TVA.  In the Notice of Involuntary Bankruptcy, Aquila asserted that the "bankruptcy petition operates as an automatic stay" and that the bankruptcy court "should address issues related to outstanding writs of garnishment, unless or until the automatic stay in bankruptcy is lifted."  After the bankruptcy petition was filed, the District Court entered an order referring the matter to the bankruptcy court.  Aquila did not seek relief from the automatic stay and made no further effort to enforce the garnishment.  After it initiated the involuntary petition, Aquila never asserted it was entitled to the garnished funds or made any effort to enforce the garnishment.  Postpetition, Aquila filed a motion for an order preserving and protecting assets of the Estate, but did not seek to restrain Debtor's receipt or use of accounts receivable.

The Trustee argues that, notwithstanding Aquila's duty to release the Garnishment Writs and Aquila's obvious abandonment of the garnishments, the automatic stay did not invalidate the Garnishment Writs and TVA was obligated to withhold payment until further order of the District Court or this Court.  This is a curious attempt to assert an improper lien that the Trustee

---

[27] *See Lawrence Athletic Club v. Scroggin (In re Scroggin)*, 364 B.R. 772, 779 (10th Cir. BAP 2007).

-15-

would otherwise find reprehensible. Undoubtedly, if Aquila were attempting to enforce the

Garnishment Writs, the Trustee would argue that the judgment lien arising from the Garnishment

Writs is unenforceable because Aquila was required to release the garnishment.[28] Yet this

improper lien is the lien the Trustee seeks to enforce. If Aquila had formally released its

garnishment as it was required to do, the Trustee would have no bases to demand payment from

TVA pursuant to § 551 because it would be inapplicable. But, because the Trustee argues that

this improper lien has been preserved for the benefit of the Estate, the Court will address that

argument.

### 4. The Estate Has Already Received the Benefit Preserved Under § 551.

The Trustee apparently contends that TVA should have paid Aquila, and pursuant to

§ 551, TVA remains liable to the Estate for the garnished funds that Aquila should have received.

The Trustee argues that he successfully avoided Aquila's garnishment liens and they are

preserved for the benefit of the estate under § 551. Without any analysis or explanation, the

Trustee further asserts that the avoided garnishment liens require TVA to pay the Estate what

TVA has already paid the Estate. Again, the Trustee's failure to provide any analysis is not

surprising.

The principal purpose of § 551 is to prevent junior lienors from improving their position

at the expense of the estate when a senior lien is avoided.[29] While avoidance of a lien under

provisions of the Bankruptcy Code may benefit the estate, preservation of the avoided lien may

---

[28] Aquila should have released the garnishment lien, and it would be improper for this Court to enforce a lien that should have been released.

[29] *Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1109 (10th Cir. 2010).

-16-

not benefit the estate in every instance.[30]  For example, if the avoided lien is the only lien on the

property, avoidance is sufficient to make the estate whole.  Although the lien is preserved for the

benefit of the estate, it is effectively merged into the estate's title.  As the Tenth Circuit has

noted, "*ordinarily* in the case of an avoided lien, the estate will be returned to its previous

position by simply avoiding the preferential lien and no further recovery will be necessary."[31]  In

some instances, recovery of the property under § 550 may be necessary to make the estate

whole.[32]  It is clear that § 551 simply preserves a lien on estate property and recovery, if

necessary, may be obtained by other means.  If TVA had paid the Garnished Accounts to Aquila,

in addition to the Trustee's avoidance of the garnishment lien under § 547 and preservation under

§ 551, recovery of the payment from Aquila under § 550 would be necessary.  But the Trustee

does not seek recovery from Aquila.

Even assuming the Trustee's argument that there is a valid garnishment lien is correct,

§ 551 does not, as the Trustee suggests, create an additional asset for the estate; it simply

preserves the avoided lien for the benefit of the estate.  Aquila's alleged garnishment lien was a

charge against the Debtor's property to secure payment of its debt.[33]  The Debtor's property that

was subject to Aquila's garnishment lien was the Debtor's right to payment from TVA.  So after

avoidance and preservation of Aquila's garnishment lien, the Debtor's right to payment from

TVA was subject to a lien to secure payment to the Estate.  In other words, the Debtor's right to

---

[30] H.R. REP. NO. 95-595, at 376 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6332.

[31] *Trout*, 609 F.3d at 1111.

[32] *Id.*

[33] § 101(37).

-17-

receive payment was subject to the Debtor's right to receive payment.  The Estate has already

received any alleged benefit preserved under § 551, and the Trustee therefore has no claim under

this section.

**E.  The Trustee Has No Claim Under § 543.**

The Trustee's complaint asserts a claim for turnover under § 543(b)(3) [sic] which

provides for surcharge of a custodian for an improper or excessive disbursement.  The Trustee's

claims under § 543 fail for two reasons.  The first reason is that § 543 does not apply to a

garnishee.  The more obvious reason is that, even if § 543 was applicable, TVA complied with its

turnover requirement.

**1.  TVA Was Not a Custodian under § 101(11).**

The Trustee asserts that "[u]nder the plain language of the Code, TVA was a

'custodian.'"  Section 101(11) states:

(11)    The term "custodian" means—

(A)    receiver or trustee of any of the property of the debtor, appointed in
a case or proceeding not under this title;

(B)    assignee under a general assignment for the benefit of the debtor's
creditors; or

(C)    trustee, receiver, or agent under applicable law, or under a contract,
that is appointed or authorized to take charge of property of the
debtor for the purpose of enforcing a lien against such property, or
for the purpose of general administration of such property for the
benefit of the debtor's creditors.

TVA was not a trustee, receiver or agent under contract, and the Trustee does not assert this

position.  The Trustee does not argue that TVA was an agent under applicable law appointed or

authorized to take charge of property for the purpose of general administration of such property

-18-

for the benefit of the Debtor's creditors.  The Trustee argues that TVA was an "agent under applicable law . . . that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property."  While a writ of garnishment may create a judicial lien within the meaning of  § 101(36) and 101(37), a garnishee is clearly and legally distinguishable from an agent appointed to take charge of property of the debtor.  Being "ordered not to pay" a debt is not the same as being ordered to "take charge of property."

A garnishee is not appointed or authorized to ***take charge of property."***  A garnishee's functions are substantively different from a receiver's or trustee's functions.  Receivers and trustees take charge or control of property and are responsible for making decisions regarding the use and disposition of the property under their control.  Garnishees have no control over property of the debtor and only act pursuant to court order.  Additionally, an account garnishee does not even have possession of property of the debtor, it simply owes a debt to the debtor.  In this case TVA was indebted to the Debtor; it did not have custody of the Debtor's property.  The Debtor's property was a right to receive payment, not funds in TVA's possession.  The Trustee himself makes this distinction in his memorandum:

> Again, TVA's argument is fundamentally flawed.  The property of the Debtor at issue in this case is not, as TVA implies, specifically identifiable funds, but rather is an intangible chose in action, TVA's obligation to pay.  Accordingly, the Garnishments were not directed at money per se, they were directed to TVA to not pay the debt without a Court order.[34]

The Garnishment Writs did not convert the Debtor's right to receive payment from TVA into anything else.  Property in the hands of an account garnishee may be subject to a lien but the

---

[34] Trustee's Memorandum in Opposition to Tennessee Valley Authority's Motion for Summary Judgment and in Support of Trustee's Motion for Partial Summary Judgment, Doc. No. 97, at 25.

account garnishee is only charged with paying the debt as directed by the court and is not charged

with enforcing the lien.

At most, the Trustee's contorted reading of § 101(11) creates an ambiguity that is

resolved by its legislative history, which states:

> There is no similar definition in current law.  It is defined to facilitate drafting,
> and means prepetition liquidator of the debtor's property, such as an assignee for
> the benefit of creditors, a receiver of the debtor's property, or a liquidator or
> administrator of the debtor's property.  The definition of custodian to include a
> receiver or trustee is descriptive, and not meant to be limited to court officers with
> those titles. ***The definition is intended to include other officials of the court if
> their functions are substantially similar to those of a receiver or trustee.***[35]

A garnishee's function is not substantively similar to that of a receiver or trustee.

An analysis of § 543 and Rule 6002 also highlights the distinction between a garnishee

and a § 101(11) custodian.  Section 543 states:

> (a) A custodian with knowledge of the commencement of a case under this title
> concerning the debtor may not make any disbursement from, or take any action in
> the administration of, property of the debtor, proceeds, product, offspring, rents or
> profits of such property, or property of the estate, in the possession, custody, or
> control of such custodian, except such action as is necessary to preserve such
> property.

> (b) A custodian shall—

>> (1) deliver to the trustee any property of the debtor held by or transferred
>> to such custodian, or proceeds, product, offspring, rents, or profits of such
>> property, that is in such custodian's possession, custody, or control on the
>> date that such custodian acquires knowledge of the commencement of the
>> case; and

>> (2) file an accounting of any property of the debtor, or proceeds, product,
>> offspring, rents, or profits of such property, that, at any time, came into the
>> possession, custody, or control of such custodian.

---

[35] H.R. REP. NO. 95-595, at 310 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6267
(emphasis added).

-20-

(c) The court, after notice and a hearing, shall—

(1) protect all entities to which a custodian has become obligated with respect to such property or proceeds, product, offspring, rents, or profits of such property;

(2) provide for payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian; and

(3) surcharge such custodian, other than an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved, after notice and a hearing, by a court of competent jurisdiction before the commencement of the case under this title.[36]

The purpose of § 543 is to: (1) establish a uniform procedure whereby property of the debtor that is held by a custodian is delivered to the control of the bankruptcy trustee; (2) ensure that the custodian and entities he is obligated to with respect to the property are protected from economic loss; (3) provide an accounting of the custodian's administration; and (4) make the custodian accountable for any improper administration.  Rule 6002 requires a custodian to promptly file and transmit to the United States trustee a report and account with respect to the property of the estate and the administration thereof.  Rule 6002 references the "superseded administration" and requires the court, after notice and hearing, to "determine the propriety of the administration." Section 543 and Rule 6002 are clearly directed toward persons that have administered and been in charge of the debtor's property, and are required to turn over any remaining property, and to account for their administration of the debtor's property.  Account garnishees do not administer the debtor's property; they simply pay a debt and have nothing to report with respect to a

---

[36] § 543(a)–(c).

"superseded administration."  While an account garnishee is required to be accountable,

bankruptcy courts are not tasked with determining the "propriety of the administration" and "the

reasonableness of all disbursements" of an account garnishee. Simply put, there is no superceded

administration and no disbursements other than payment made pursuant to the garnishment writ.

There is ample case law finding that a garnishee, or similar entity, is not a § 101(11)

custodian.  For example, the court in *In re Georgia Steel, Inc.* concluded that a garnishee bank

was not a § 101(11) custodian,[37] while the court in *In re McCary* held that a debtor's employer

holding money owed to the debtor and acting pursuant to a wage deduction summons was not a

"custodian" within the meaning of the Bankruptcy Code.[38]  The court in *In re Camdenton United*

*Super, Inc*. held that the language of § 101(11) requires that, "to be considered a custodian, an

entity must be engaged in the general administration of the debtor's assets for the benefit of

creditors."[39]  In addition, the court in *In re Pride Foods, Inc.* concluded that a creditor with a

prejudgment writ of attachment was not a custodian.[40]

The case law cited by the Trustee is unpersuasive and inapplicable.  The Trustee relies

primarily on *In re Atlas Shipping A/S*.[41]  *Atlas* was a chapter 15 proceeding and involved

maritime attachment liens governed by Rule B of the Supplemental Rules for Admiralty or

---

[37] *Ameron Protective Coatings Div. v. Georgia Steel, Inc. (In re Georgia Steel, Inc.*), 25 B.R. 781, 787 (Bankr. M.D. Ga. 1982).

[38] *In re McCary*, 60 B.R. 152, 154 (Bankr. N.D. Ill. 1986).

[39] *In re Camdenton United Super, Inc.*, 140 B.R. 523, 525 (Bankr. W.D. Mo. 1992).

[40] *In re Pride Foods, Inc.,* 22 B.R. 356, 358 (Bankr. D. Neb. 1982).

[41] *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009).

Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure.[42]  In

concluding that § 1521 makes § 543 inapplicable in chapter 15 cases, the court, without any

analysis, stated: "Section 101(11)'s definition of custodian . . . encompasses a garnishee bank

that has restrained the debtor's funds," and cited to *In re DeLancy*.[43]  The *DeLancey* case is

clearly distinguishable from this present case because it did not involve a garnishee.  In the

*DeLancey* case, the state court had directed that the debtor's equipment and machinery be sold,

and the proceeds from the sale be deposited ***in escrow*** and held subject to its determination as to

an appropriate distribution of the funds.  In *DeLancey*, the bank was acting as a court ***appointed***

escrow ***agent*** in possession of the debtor's property.

    The language the Trustee quotes from *In re Eggleston*[44] is misleading and is taken out of

context.  The Trustee acknowledges in a footnote that the *Eggleston* case was a § 547 case but,

the Trustee argues, "the *Eggleston* court's analysis of garnishment principles is helpful to the

§ 101(11) analysis of whether a garnishee is an 'agent under applicable law . . . appointed or

authorized to take charge of the property of the debtor for the purpose of enforcing a lien against

such property.'"[45]  It is not.  The *Eggleston* case does not even mention § 101(11) and the only

---

[42] *Id*. at 731.

[43] *Id*. at 746 (citing *Barr v. Juniata Valley Bank (In re DeLancey)*, 77 B.R. 424, 429 (Bankr. S.D.N.Y. 1987)).

[44] *Eggleston v. Third Nat'l Bank in Nashville (In re Eggleston)*, 19 B.R. 280 (Bankr. M.D. Tenn. 1982).

[45] Trustee's Memorandum in Opposition to Tennessee Valley Authority's Motion for Summary Judgment and in Support of Trustee's Motion for Partial Summary Judgment, Doc. No. 97, at 37 n.20.

use of the term "custodian" is in a citation to *Beaumont v. Eason*,[46] a Tennessee state law case

from 1873.  The fact that the *Eggleston* court used the term "custodian" in its opinion is not

helpful to the Trustee because the § 101(11) definition of custodian is very specific and is not

intended to encompass every situation where a party may be referred to as a custodian.

If one actually reads the *Beaumont* case, it is clear that the court explains that "the service

of a garnishment on a garnishee differs from the levy of an execution by a sheriff on personal

property"[47]and the case is helpful in understanding that an account garnishee does not hold

property of the debtor.  The *Beaumont* court made clear that service of a garnishment on a

garnishee creates a lien upon the debt in his hands, as opposed to a levy of an execution, which

divests the title out of the debtor and transfers both the title and the possession to the officer.[48]

Lastly, the Trustee's off hand citation to *Davis v. Cox*[49] and the suggestion that garnished

accounts are held in *custodia legis* is inapplicable and deserves little analysis.  A garnishment is

simply a writ that creates a judicial lien and does not put property in the custody of the court.

The reason is obvious: there is no property that the court takes custody of.

**2.  Even If TVA Were a Custodian, Because TVA Paid the Debtor's Authorized Agent in Full, TVA Complied With § 543 and the Trustee Has No Remedy Under § 543.**

The Trustee argues that TVA's payment to Standard did not "exonerate" TVA's debt

because it did not comply with § 543 and Rule 6002 which "give the custodian a method by

---

[46] *Beaumont v. Eason*, 59 (12 Heisk Tenn. 417 (1873).

[47] *Id*. at 420.

[48] *Id*.

[49] *Davis v. Cox*, 356 F.3d 76, 93 (1st Cir. 2004).

-24-

which it can exonerate its debt to the debtor." This argument borders on the frivolous. Even if

TVA were a § 101(11) custodian, TVA clearly complied with the requirements of § 543(b)—it

turned over the Garnished Accounts to the Debtor. The Trustee also incorrectly argues that

section 101(11) custodians have a "debt" that must be "exonerated." Custodians under § 543 do

not have debts owing to the debtor. Section 543(b) requires a custodian that has possession of

estate property at the time of filing to deliver that property to the trustee or debtor in possession.[50]

But even assuming TVA was a section 101(11) custodian that held property of the Debtor, by

delivering the Garnished Accounts[51] to the Debtor's authorized agent, TVA complied with the

requirement under § 543(b).

Section 543(c) provides that the court shall surcharge a custodian for any improper or

excessive disbursement of property. The Trustee suggests that TVA's failure to request a hearing

under § 543(c) or file an accounting pursuant to § 543(b)(2) and Rule 6002 means TVA "has

exposed itself to liability" for funds it has already paid to the Estate. The turnover provisions of

§ 543 are mandatory, and a hearing is not required prior to turnover. And while a custodian may

be compelled to file an accounting, failure to file an accounting does not make a custodian liable

for property it has already turned over to the debtor. And finally, even if TVA were a § 101(11)

custodian, was required to wait for a hearing prior to turnover, and failed to file an accounting,

---

[50] *In re Bryant Manor, LLC*, 422 B.R. 278, 289 (Bankr. D. Kan. 2010).

[51] TVA challenges the legal effectiveness of the Garnishment Writs, arguing that under
Utah law, because the ownership of the property held by TVA was subject to dispute, the
garnishment order was not effective with respect to the funds held by TVA. The Court need not
determine the effectiveness of the Garnishment Writs because TVA ultimately complied with the
requirements of § 543(b), thereby making TVA's challenge to the effectiveness of the
Garnishment Writs moot.

TVA is only liable for an improper or excessive disbursement.  Because TVA delivered the

Garnished Accounts to the Debtor, the disbursement was neither improper nor excessive.  The

delivery of the Garnished Accounts to Standard made it possible for the Debtor to continue its

mining operations and remain a going concern.  Where delivery by the custodian appears to have

been necessary to preserve the debtor's property, that fact will militate against surcharge.[52]


## V.  CONCLUSION

What all of the Trustee's arguments fail to address is injury to the Debtor or the Estate.

Assuming TVA was a § 101(11) custodian, it turned over the property in its possession.  If there

were a valid garnishment lien that was preserved for the benefit of the Estate, the Estate has

received the benefit.  Upon the filing of the involuntary petition, Aquila should have released the

Garnishment Writs, and the Garnished Accounts should have been, and they were, paid to the

Debtor.  The Estate is exactly where it would have been if Aquila had formally released its lien

immediately after the commencement of the involuntary case.  The Debtor received all that it was

entitled to receive, and the Estate is not entitled to receive more.  A separate order will

accompany these Findings and Conclusions in Support of Order Granting Tennessee Valley

Authority's Motion for Summary Judgment.

_____END OF DOCUMENT_____

---

[52] *Paren v. Noneman (In re Paren)*, 158 B.R. 447, 451 (Bankr. N.D. Ohio 1993).

-26-

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **FINDINGS AND CONCLUSIONS IN SUPPORT OF
ORDER GRANTING TENNESSEE VALLEY AUTHORITY'S MOTION FOR
SUMMARY JUDGMENT** will be effected through the Bankruptcy Noticing Center to each
party listed below.


Edward C. Meade
Richard E. Riggs
TENNESSEE VALLEY AUTHORITY
OFFICE OF THE GENERAL COUNSEL
400 West Summit Hill Dr. (WT 6A)
Knoxville, TN 37902
        *General Counsel for Tennessee Valley Authority*

David P. Billings
Robert H. Scott
AKERMAN LLP
170 South Main Street, Suite 950
Salt Lake City, UT 84101
        *Attorneys for Tennessee Valley Authority*

Peter W. Billings, Jr.
Douglas J. Payne
FABIAN & CLENDENIN
215 South State Street, Suite 1200
Salt Lake City, UT 84111-2323
        *Counsel for the Chapter 11 Trustee*

Kenneth A. Rushton, Trustee
P.O. Box 212
Lehi, UT 84043
        *Former Chapter 7 Trustee*

Michael N. Zundel
Glenn R. Bronson
Aaron Millar
Tyler O. Waltman
Daniel C. Dansie
PRINCE, YEATES & GELDZAHLER
15 West South Temple, Suite 1700
Salt Lake City, UT 84101
        *Counsel for the Former Chapter 7 Trustee*

-27-

Kim R. Wilson
David L. Pinkston
P. Matthew Cox
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145-5000
    *Attorneys for Standard Industries, Inc.*